UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| HIPOLITO FONTES,<br><br>            Plaintiff,<br><br>      v.<br><br>THE CITY OF CENTRAL FALLS; THE<br>CITY OF CENTRAL FALLS BOARD OF<br>CANVASSERS AND REGISTRATION;<br>GERTRUDE CHARTIER, in her official<br>Capacity as Registrar of the City<br>of Central Falls Board of<br>Canvassers; ALFRED GREGORIE, in<br>his official Capacity as a Chairman<br>of the City of Central Falls Board<br>of Canvassers; MELVIN GOLDENBERG,<br>in his official capacity as Clerk<br>of the City of Central Falls Board<br>of Canvassers; ROSEMARIE CANAVAN,<br>in her official capacity as a<br>Member of the City of Central Falls<br>Board of Canvassers; CHARLES D.<br>MOREAU,<br><br>            Defendants. | C.A. No. 09-437 S |

## OPINION AND ORDER

WILLIAM E. SMITH, United States District Judge.

Aspiring mayoral candidate Hipolito Fontes ("Fontes" or "Plaintiff") appears before the Court three signatures shy of having his name placed on the ballot of an otherwise uncontested race in the City of Central Falls. After having sixty-five signatures deemed invalid on his nomination papers pursuant to Art. VI, § 6-110 of the Central Falls City Charter (the first to file

rule), Fontes filed suit against the City of Central Falls, the City of Central Falls Board of Canvassers and Registration, Gertrude Chartier, Alfred Gregorie, Melvin Goldenberg, Rosemarie Canavan, in their official capacities, and Charles Moreau ("Moreau"), the incumbent Mayor of Central Falls (collectively "the City").[1] Fontes seeks to permanently enjoin the enforcement of the part of § 6-110 that invalidates second-filed signatures, in order to increase the number of valid signatures on his nomination papers from 197 to 262, thereby surpassing the required number necessary to allow him to appear on the ballot.   With city elections looming, Fontes moved for an expedited hearing and decision on the constitutionality of the first to file rule contained in § 6-110.[2]

In preparation for the hearing and after conference with the Court, the parties filed a joint statement of stipulated facts, as well as memoranda of law on the issue of whether § 6-110 is constitutional and whether a permanent injunction is an appropriate

---

[1] Art. VI, § 6-110 of the Central Falls Charter was approved by 1953 R.I. Pub. Laws, ch. 3239, § 11 titled "An Act Pertaining to Municipal Primaries and Elections in the City of Central Falls, and Validating Certain Provisions in the City of Central Falls Home Rule Charter."

[2] In his Complaint, Plaintiff also alleges due process violations because of alleged misconduct by Moreau and his agents, as well as the staff of the Board of Canvassers, which Defendants adamantly deny.   However, because of the time constraints of the impending election, the parties agreed to hold an evidentiary hearing and submit a joint statement of facts on the sole issue of the facial constitutionality of § 6-110.   Given the Court's determination that the first to file rule is unconstitutional, it is unnecessary to reach the Plaintiff's due process claims.

remedy under the circumstances.   In addition, three witnesses offered live testimony at the hearing: Hipolito Fontes, Phillip St. Pierre, and Gertrude Chartier.   Both before and during the hearing, Defendants moved to dismiss the Complaint arguing that the relief sought, enjoining § 6-110, was futile.   Defendants argued that Fontes would not be allowed to appear on the ballot even if successful because he also violated a state law that prohibits declaring dual candidacies.

After considering the testimony and arguments presented by the parties, their briefs, and the joint statement of facts and exhibits submitted, the Court concludes that the first to file rule contained in § 6-110 is not necessary to further the government's stated interests in reducing ballot clutter or in demonstrating a candidate's support in the community.   It is on its face, therefore, an unconstitutional impediment to voters and candidates in the exercise of their First Amendment and Fourteenth Amendment rights; therefore, the application of the first to file rule contained in § 6-110 must be permanently enjoined.

I.   **Findings of Fact**

The general election in the City of Central Falls, including the election for Mayor, will be held on November 3, 2009. Candidates for Mayor of Central Falls must collect at least 200 valid signatures from Central Falls registered voters (approximately 6,534 registered voters being eligible during the

3

time in question) on their nomination papers, to appear on the ballot as a candidate in accordance with the City Charter. Section 6-110 of the City Charter provides in relevant part:

> Nominating petitions for city officers to be elected at large shall require the signatures of not less than two hundred qualified electors of the city . . . Should an elector sign more nominating petitions for any office than the number of candidates for said office for which he would be eligible to vote in the municipal election, his signature shall be void except as to the said number of petitions for said office signed by him first filed.[3]

Gertrude Chartier ("Chartier"), the Registrar for the City, testified at length on the cumbersome and time-consuming procedure used to implement the first to file rule in § 6-110. She testified that nomination papers containing signatures are brought in by the declared candidates, or their agents, on a rolling basis throughout the nomination period. The papers are immediately time-stamped. In a situation where a registered voter signs more than one nomination form, the signature is only valid toward the nomination of the candidate that first brought the signature into the Canvassers office. All signatures of that person thereafter, for other candidates for the same elected office, are considered invalid as "duplicates."

This first to file rule is peculiar to Central Falls (and perhaps one or two other Rhode Island communities). Under Rhode

---

[3] It is this last sentence, "Should an elector sign more nominating petitions . . ." that is the subject of the permanent injunction.

Island state election law, there is no such limitation on voters'
ability to endorse nomination papers of potential candidates.
Pursuant to R.I. Gen. Laws § 17-14-9 "[a] voter may sign any number
of nomination papers for any office the voter may lawfully vote for
at the general election." Chartier noted at the hearing that the
incongruent rules historically have caused confusion amongst
candidates who may run for city office in one election and state
office the next.

On August 25, 2009, the Plaintiff filed two Declaration of
Candidate forms with the Central Falls Board of Canvassers. Fontes
testified that he handed Chartier his Mayoral Declaration first,
followed by the Declaration of Candidate form for City Council,
Ward 1. Chartier testified (albeit with less certainty) that she
thinks she time-stamped Fontes' Mayoral Declaration before the City
Council Declaration.[4] Both Declarations were time-stamped at 11:45
a.m. on August 25, 2009, but both Chartier and Fontes testified
that one Declaration actually was stamped seconds ahead of the
other. Section 17-14-2(b) of the R.I. Gen. Laws states:

> No person shall be eligible to file a declaration of
> candidacy, or be eligible to be a candidate or eligible
> to be voted for or to be nominated or elected in any
> party primary or general election if that person has
> declared to be a candidate for another elected public
> office, either state, local or both.

---

[4] No evidence was submitted to contradict Fontes clear
recollection or Chartier's less clear memory that the Mayoral
papers were stamped first in time. Therefore, the Court finds as
a fact that the Mayoral Declaration was first-filed.

Fontes submitted 333 signatures toward his nomination for Mayor of Central Falls.[5]   Chartier invalidated 136 of the signatures submitted by Fontes.  Of those invalidated signatures, sixty-five were rendered invalid as duplicates.  Moreau submitted 2,058 signatures toward his nomination.  Several hundred signatures were deemed invalid and 116 were invalidated as duplicates.

During the September 8, 2009, Central Falls Board of Canvassers (the Local Board) meeting, the Local Board voted to disqualify Fontes for failing, by three signatures, to meet the minimum 200 signature threshold.  At the same meeting, the Local Board applied R.I. Gen. Laws § 17-14-2(b) against Edna Poulin, who had submitted declaration papers for both Mayor and City Council, invalidating her candidacy for the City Council.  However, after Poulin successfully appealed to the Rhode Island Board of Elections (the State Board), pursuant to R.I. Gen. Laws § 17-7-5 (d) ("The state board shall also have jurisdiction over all election matters on appeal from any local board and over any other matters pertinent and necessary to the proper supervision of the election laws."), the State Board reversed the Local Board's decision and invalidated Poulin's candidacy for Mayor instead.  The State Board agreed that

---

[5] Fontes did not collect any signatures relative to the City Council position, and he testified that he dropped the idea of running for City Council some time after filing.  Fontes claimed there was no procedure of which he was aware to withdraw nomination papers; Chartier indicated there was a procedure and a form.  In the end, it does not matter to the outcome of this challenge, so the dispute need not be resolved.

Poulin filed her Declaration of Candidacy for City Council before that of Mayor, and thus her initial declaration was the valid one. See Unofficial Minutes of the Rhode Island Board of Elections, September 23, 2009.

Fontes filed this action on September 18, 2009, pursuant to 42 U.S.C. § 1983 seeking a declaratory judgment that § 6-110 of the City Charter violates his rights under the First and Fourteenth Amendments to the United States and Rhode Island Constitutions, and requesting that the Court permanently enjoin the Local Board from enforcing § 6-110, with respect to that portion of the provision that pertains to invalidating second-filed signatures. See Regan v. Time, Inc., 468 U.S. 641, 652 (1984) ("[A] court should refrain from invalidating more of the statute than is necessary."). Ultimately, Fontes wishes to have his name placed on the ballot against Moreau in the upcoming election for Mayor of Central Falls. Fontes argues that a permanent injunction against the application of the first to file rule would permit the sixty-five signatures that were deemed invalid as "duplicates" to be considered valid for the purposes of his nomination papers. Accordingly, Fontes argues he would then meet the minimum 200 signature threshold and his name would be placed on the ballot to run against the presently unopposed incumbent.

II.   **Discussion**

  A.   **Dual Candidacies**

7

Before turning to the merits of the constitutional challenge to § 6-110, the threshold issue of whether Fontes' request to enjoin the application of § 6-110 is futile because he is otherwise ineligible must be addressed.[6] Defendants argue that enjoining the first to file rule contained in § 6-110 is a fool's errand because Fontes will be disqualified from the mayoral race on an independent basis, specifically, because he simultaneously filed a City Council declaration of candidacy.   The question of whether Fontes faces disqualification from the mayoral race because he declared for two offices requires application of R.I. Gen. Laws § 17-14-2(b).   The State Board interpreted § 17-14-2(b), as recently as with Edna Poulin in Central Falls, to operate to disqualify the potential candidate only from the second office for which he or she declared. In Poulin's case the State Board found that she was disqualified from the mayoral race and qualified to be placed on the ballot for the City Council.

Unfortunately, the Rhode Island Supreme Court has not had the occasion to consider the application of R.I. Gen. Laws § 17-14-2(b) in invalidating the candidacy of any person.   Thus, this Court is asked to answer the question as a matter of first impression.   It could be argued that a question such as this is a good candidate for certification to the Rhode Island Supreme Court.   See McInnis

---

[6] The Court is satisfied that any attempt by Fontes to exhaust his administrative remedies by appealing the application of § 6-110 to the State Board would have been futile.

v. Harley-Davidson Motor Co., 625 F. Supp. 943 (D.R.I. 1986). Time constraints, however, preclude that option. With the ballot being printed on October 9, 2009, this Court is required to act without delay. "Where a federal court must interpret an area of unsettled state law, its task is to forecast how the highest court of that state would decide the issue." Torres-Negron v. Rivera, 413 F. Supp. 2d 84, 85 (D.P.R. 2006) (citing In re Boston Reg'l Med. Ctr., Inc., 410 F.3d 100, 108 (1st Cir. 2005) (citing Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996); McKenna v. Ortho Pharm. Corp., 622 F.2d 657, 662 (3d Cir. 1980)).

In a case such as this, the Rhode Island Supreme Court would consider the question of statutory construction de novo, and is bound to apply the plain and ordinary meaning of the words of the statute. Town of Burrillville v. Pascoag Apartment Assocs., 950 A.2d 435, 445 (R.I. 2008). When ambiguity presents itself in a statute, the Court employs its "well-established maxims of statutory construction in an effort to glean the intent of the Legislature." Id. at 445. Although not controlling, the Court should give deference to "an agency's interpretation of an ambiguous statute that it has been charged with administering and enforcing, provided that the agency's construction is neither clearly erroneous nor unauthorized." Id. (citing Rossi v. Employees' Retirement Sys., 895 A.2d 106, 113 (R.I. 2006)). The Rhode Island Supreme Court has gone so far as to say that the

agency's interpretation is entitled to great weight. See <u>State v.</u> <u>Swindell</u>, 895 A.2d 100, 104 (R.I. 2006). Furthermore, in the face of an ambiguous statute, the Court will afford such deference "even when the agency's interpretation is not the only permissible interpretation that could be applied." <u>Murray v. McWalters</u>, 868 A.2d 659, 662 (R.I. 2005) (quoting <u>Pawtucket Power Assocs. Ltd.</u> <u>P'ship v. City of Pawtucket</u>, 622 A.2d 452, 456-57 (R.I. 1993)).

Defendants argue that once a person files two declarations of candidacy, that person is ineligible for all positions applied for. However, this reading appears at odds with the plain language of the statute.

> No person shall be eligible to file a declaration of candidacy, . . . <u>if that person has declared to be a</u> <u>candidate for another elected public office</u>.

R.I. Gen. Laws § 17-14-2(b) (emphasis added).

The most obvious interpretation of the words of the statute is that a person who has declared for one public office, is thereafter ineligible to run for any subsequent office for which that person may declare. The individual's disqualification from candidacy is premised upon his or her already being a declared candidate for <u>another</u> elected public office. In the present situation, Fontes had declared himself a candidate for Mayor, and thus, he became immediately ineligible to file a declaration of candidacy for the City Council. Defendants' urge the Court to interpret the statute not as an ineligibility provision, but as a punitive measure, i.e.

if you declare for more than one office you forfeit your right to be a candidate for any office.  This interpretation not only flies in the face of the plain meaning of the statute, it operates to exclude citizens from the political process as candidates, and arguably disenfranchises voters who wish to support such candidates.  This Court is at a loss for any reason why the Legislature would intend such an anti-democratic result, and Defendants have supplied none.  See Shepard v. Harleysville Worcester Ins. Co., 944 A.2d 167 (R.I. 2007) ("This Court will not construe a statute to reach an absurd result.") (alterations, quotation marks, and citation omitted).

Moreover, even if the Court were to accept as a starting point, as Defendants suggest, that the statutory language is ambiguous (which it is not), the State Board's interpretation of the statute in prior cases (while not directly involving Fontes) is entitled to some deference, and obviously is not clearly erroneous. Rather, it is apparent that the State Board's interpretation, most recently applied in the Poulin case, offers a reasonable reading of the statute.

The evidence shows that Fontes filed the Mayoral declaration before the City Council declaration.  Therefore, Fontes is disqualified from running for the City Council; but, he is still permitted to run for Mayor.  The only obstacle precluding Fontes from appearing on the ballot for Mayor is the question of sixty-

five duplicate signatures rendered invalid by application of § 6-110 of the City Charter.

**B.    Constitutionality of the First To File Rule in § 6-110**

"States have the discretion to establish certain conditions under which the right of suffrage may be exercised and the right to hold public office determined." Gelch v. State Bd. of Elections, 482 A.2d 1204, 1207 (R.I. 1984) (citing Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 50 (1959)).  As this Court recently noted, in matters of election law, the Court is required to use a flexible standard of review when measuring the constitutionality of a statutory provision, and the "applicable level of scrutiny corresponds to the constitutional burden: the lighter the burden, the more forgiving the scrutiny; the heavier the burden the more exacting the review." Mollis v. Block, 618 F. Supp. 2d 142, 149 (D.R.I. 2009); see also Burdick v. Takushi, 504 U.S. 428, 434 (1992) ("the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights").

To make this determination, the Court must first consider "the character and magnitude of the asserted injury to the rights protected. . . . It then must identify and evaluate the precise interests put forward by the State as justifications for the burden." Mollis, 618 F. Supp. 2d at 149 (quoting Anderson, 460

U.S. at 789).  Perhaps most importantly, the Court must "not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights."  Id. (quoting Anderson, 460 U.S. at 789).

The direct impact of the first to file rule falls upon the "aspirants for office," however, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters."  Anderson, 460 U.S. at 786; Clements v. Fashing, 457 U.S. 957, 963 (1982).  Indeed, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."  Anderson, 460 U.S. at 786 (quoting Bullock v. Carter, 405 U.S. 134, 143 (1972)).

The Supreme Court has said "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights."  Anderson, 460 U.S. at 786.  Restrictions on access to the ballot have been said to trigger many concerns including: (1) "the right of qualified voters . . . to cast their votes effectively[,]" Mollis, 618 F. Supp. 2d at 148 (quoting Williams v. Rhodes, 393 U.S. 23, 30 (1968)); (2) the tendency "to limit the field of candidates from which voters might choose[,]"  Anderson, 460 U.S. at 786; and (3) the unfair or unnecessary burden that is placed

upon the "availability of political opportunity[,]" <u>Clements</u>, 457 U.S. at 964 (quoting <u>Lubin v. Panish</u>, 415 U.S. 709, 716 (1974)).

Here, the burden imposed by the relevant part of § 6-110 that invalidates second-filed signatures is at least threefold. First, § 6-110 limits the ability of individual voters to express their wish to nominate more than one candidate for an office because only one signature will count. And, of course, the petition signer has no control over which signature will count because this will be determined by the candidate's race to the Canvassers office. Thus, a voter's second signature or second choice may secure that voter's nomination endorsement to the exclusion of his or her first choice.

Second, a candidate who wishes to exclude potential rivals can effectively do so by collecting vastly more signatures than needed to get on the ballot. In the Central Falls Mayor's race, Moreau's petition had over 1,500 more signatures than necessary for his nomination. In all likelihood, those 1,500 signatures were neither counted toward Moreau's petition (because they were surplusage to the 200 needed) nor towards Fontes' petition (because they were, or would be, excluded as duplicates). This effectively disenfranchises the ability of 1,500 Central Falls registered voters to participate in the process of nominating anyone. Instead, unbeknownst to the petition signers, their signatures are actually used as a blocking mechanism to directly restrict "the field of candidates from which [the voters] may choose." <u>Anderson</u>,

14

460 U.S. at 786.  This concern was captured in the Local Board meeting minutes, which were provided to the Court, where it was noted that "the practice of collecting an excess amount of signatures (hundreds) as in the case of Mayor Moreau [was questioned] . . . [in that it] was not good practice as it hindered other candidates from collecting their required signatures." (Ex. J to the Joint Statement of Stipulated Facts, Doc. 24-11.)  As the Supreme Court said in <u>Anderson</u>,

> voters can assert their preferences only through candidates. . . a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues. (Citations omitted.) The right to vote is "heavily burdened" if that vote may be cast only for major-party candidates at a time when other parties or other candidates are "clamoring for a place on the ballot."

<u>Anderson</u>, 460 U.S. at 787.

Third, the impact upon hopeful candidates is also substantial, as they are required to predict (or, more realistically, to guess) the number of duplicate signatures that may be standing between them and the ballot.  Then, regardless of who actually obtains the signature first, candidates are forced into a race to the Board of Canvassers' time-stamp, in order to capture the signature on his or her papers.[7]

---

[7] Chartier testified that candidates could come in and look at other candidates' nomination papers, and presumably could copy the names of the signers; to receive actual copies however, Chartier testified she could take the full ten days allowed by statute because of the heavy work load in the office.  All of this is largely beside the point.  The fact that a candidate might be

The absurdity of all this is obvious: Candidates pull nomination papers on the appointed date, and then proceed to race around town collecting signatures.  Then, candidates must engage in a race to the Board of Canvassers office in hopes of reaching the time-stamp machine first.  And, of course, if City Hall is controlled by an incumbent mayor who is running for re-election and who may literally have the keys to City Hall, he could have a critical head start in the race.  If, by chance, both candidates arrive at the canvassers office simultaneously, the question arises, whose papers should be stamped first?  The decision could (and did here, apparently) have dramatic impact – the difference between a contested or uncontested race for Mayor.  One does not have to be a complete cynic about small town politics[8] to see the potential for manipulation.

While the magnitude of requiring 200 non-duplicative signatures to appear on the ballot for Mayor, from an eligible pool of approximately 6,500 registered voters, is not terribly onerous in its own right, and the Court must agree that the character of the rule is neutral and non discriminatory, still, the burden

---

allowed to copy down names from other candidates' papers before going out to hunt for signatures, is no remedy to the constitutional flaws presented by the first to file rule.

[8] "Politics, n.  A strife of interests masquerading as a contest of principles.  The conduct of public affairs for private advantage."  Ambrose Bierce, The Devil's Dictionary 148 (Oxford University Press 1999).

16

placed upon the rights protected by the First and Fourteenth Amendments is substantial.   Even if the Court were to agree with Defendants, given the relatively low number of signatures needed to be nominated, that the burden is not so great as to require an "exacting review" of § 6-110, the Defendants must identify with some precision the interests that necessitate the burdens outlined above.   The query may not end with the blind recitation of "the familiar 'go-to' concerns about ballot clutter and confusion." Mollis, 618 F. Supp. 2d at 149.   The Court does not act as a rubber stamp to these interests, but must evaluate the strength and legitimacy of the Defendants' justifications.

Defendants argue that the first to file rule is a reasonable regulation that ensures orderly and fair elections and ensures that ballots are not cluttered by frivolous candidates who cannot demonstrate support from the electorate.   While the Court accepts "as a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process," this should not be interpreted by the City as carte blanche to regulate elections without due regard to the burden being imposed. Anderson, 460 U.S. at 788 (citing Storer v. Brown, 415 U.S. 724, 730 (1974)).   "[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." Illinois State Bd. of Elections v. Socialist

Workers Party, 440 U.S. 173, 185 (1979) (quoting Kusper v. Pontikes, 414 U.S. 51, 58-59 (1973)).

Defendants have failed to offer any evidence demonstrating how the first to file rule eliminates chaos and clutter in elections. Rather, Defendants offer only the usual generalities and platitudes. Indeed, the testimony of Chartier demonstrated that the additional and differing rules imposed by the City, which are at odds with those of the State of Rhode Island, serve to generate confusion, not eliminate it, and to foster chaos, not reduce it. Taken a step further, the City's proffered justifications do not even satisfy the relatively low hurdle of offering a rational basis for invalidating the signatures of voters because one candidate arrived to the Canvassers office ahead of the other. Cf. Brock v. Sands, 924 F. Supp. 409 (E.D.N.Y. 1996) (holding limitation on number of nominating petitions an individual can sign in community school board elections where voters could select multiple candidates did not survive rational basis review; but suggesting that it may provide a rational basis in single-position elections).

Finally, the Court is satisfied that Plaintiff has met his burden and demonstrated that a permanent injunction is the appropriate remedy to rectify these constitutional violations. Based upon the record and the briefs, Fontes has shown (1) that permitting the election to carry on without his candidacy will cause him irreparable injury; (2) that the remedies at law are

inadequate compensation; (3) that the harm to Plaintiff outweighs the harm Defendants would suffer if an injunction is imposed; and (4) that an injunction will not adversely affect the public interest. <u>Mollis</u>, 618 F. Supp.2d at 155. For these reasons, the Court agrees that an injunction is the proper remedy for this case.

## III. Conclusion

Because there is no legitimate interest served by the first to file rule contained in § 6-110, and because the burdens imposed upon potential candidates and the electorate are substantial and completely without justification, the Court grants Plaintiff's Motion for Permanent Injunction and denies Defendants' Motion to Dismiss. Accordingly, the City of Central Falls Board of Canvassers is hereby enjoined from invalidating signatures on Fontes' nomination papers on the basis that such signatures were on another candidate's papers, which were filed prior to Fontes' papers. Further, if Fontes has the requisite 200 signatures of registered voters, the Board shall place Fontes' name on the ballot for Mayor for the November 3rd election.

IT IS SO ORDERED.

_William E. Smith_
William E. Smith
United States District Judge
Date: 10|8|09